# Effect of a Judicial Stay on
# Administrative Fund Termination Proceedings

Under the nondiscrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1972, the administrative process by which funds are suspended or terminated is independent of any contemporaneous judicial proceeding, and a stay entered in the judicial proceeding thus has no effect on an administrative decision to suspend or terminate funds.

The Law Enforcement Assistance Administration is free to defer administrative fund suspension or termination proceedings during the pendency of a judicial stay, but is foreclosed from restoring funds that have already been suspended or terminated except in accordance with the procedures set forth in the Omnibus Crime Control and Safe Streets Act.

Under the nondiscrimination provisions of the Revenue Sharing Act, the Office of Revenue Sharing is required to suspend administrative enforcement proceedings, and to restore funds already suspended or terminated, whenever a stay is issued in the judicial proceeding that triggered the administrative enforcement action.

March 14, 1980

## MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY
## GENERAL, CIVIL RIGHTS DIVISION

This responds to your request for our opinion on the effect of a stay pending appeal upon fund termination proceedings of the Office of Revenue Sharing (ORS) in the Department of the Treasury under the civil rights provisions of the State and Local Fiscal Assistance Act of 1972, as amended (Revenue Sharing Act), 31 U.S.C. § 1242, and upon the Law Enforcement Assistance Administration (LEAA) under the analogous provisions of the Omnibus Crime Control and Safe Streets Act of 1972, as amended (Crime Control Act), 42 U.S.C. § 3789d(c).* Both statutes include provisions that require the agencies to institute their own enforcement proceedings whenever they learn of a judicial or administrative determination that a recipient has discriminated in violation of federal law, and both provide for automatic suspension of funds to a recipient within a fixed time thereafter. The question has arisen whether a stay pending appeal of a lower court order vacates or defers administrative fund suspension.

---

*NOTE: Under § 815(c) of the Justice Systems Improvement Act of 1979, Pub. L. No. 97-157, 93 Stat. 1167, 1206-09, the Office of Justice Assistance, Research and Statistics replaced LEAA as the entity responsible for administrative enforcement of the nondiscrimination provisions of the Crime Control Act. Ed.

Your division takes the position that a stay has the legal effect of vacating or deferring such suspension. Both the Department of the Treasury and LEAA disagree. The two agencies maintain that the administrative process by which funds are terminated under the two acts is independent of any contemporaneous judicial proceeding, whether or not the same issues of discrimination are involved, and whether or not their administrative process has been triggered in the first instance by a determination in the judicial proceeding. Therefore, in their view a stay entered in the judicial proceeding has no effect on an administrative decision to suspend funds. The Civil Rights Division memorandum takes the position that the administrative role under both statutes is merely "ancillary and supportive" of the judicial process, and that the agencies are therefore obliged "to honor" a judicial stay by suspending their administrative procedures or, if necessary, restoring the flow of federal funds.

For reasons stated hereafter, we agree with your Division's position on the effect of a stay on administrative fund suspension under the Revenue Sharing Act, but find merit in the position advanced by LEAA in interpreting its responsibilities under the Crime Control Act. We believe the law requires ORS, whose actions are triggered by and are to some extent dependent on a judicial determination, to conform its actions to those of a court granting a stay. And we think that Congress intended this administrative conformity to extend to the restoration of funds already suspended or terminated. Although neither the terms nor the legislative history of the relevant provisions of the Revenue Sharing Act deal with the effect of a stay on ORS proceedings, we believe that Congress intended to assure recipients of federal funds under that Act an opportunity to contest a preliminary determination of discrimination, and to avoid fund suspension by showing a likelihood of ultimate success on the merits. Because in federal court one of the grounds for granting a stay pending appeal in this context is precisely this likelihood of success on the merits,[1] we believe that Congress, had it considered

---

[1] The Federal Rules of Civil Procedure provide that an interlocutory or final order in an action for an injunction will not be stayed except pursuant to the provisions of Rule 62(c). This provides in pertinent part that:

> when an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the adverse party.

Rule 8(a) of the Federal Rules of Appellate Procedure provides that a stay pending appeal ought in the first instance to be sought in the district court, but that a motion for relief may be made in the court of appeals where such a course is not practicable or where the district court has denied an application. Because a stay itself has the effect of an injunction or restraining order, the requirement in Rule 65(d) that it be accompanied by a statement of reasons has been held to apply. See Moore's Federal Practice § 62.05 at 62-21 through 22 (1979 ed.). An applicant for a stay pending appeal under FRCP Rule 62(c) or FRAP Rule 8(a) must make a "strong showing" that he will succeed on the merits of his appeal. See Belcher v. Birmingham Trust Nat. Bank, 395 F.2d 685 (5th Cir. 1968); Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C. Cir. 1958); Mandel v. HEW, 417 F. Supp. 57

Continued

the issue, would not have approved the continuance of administrative procedures leading to fund termination in the face of a federal judicial stay and in disregard of it.

The analogous provisions of the Crime Control Act differ significantly from those of the Revenue Sharing Act, however, and in our view these differences make persuasive LEAA's argument that its own administrative process was intended by Congress to be independent of any concurrent litigation involving the same issues of discrimination. At the same time, we believe that LEAA is free under its statute to defer administrative fund suspension in the event of a judicial stay, and that sound policy may in some cases dictate such deferral. Unlike ORS, however, LEAA is probably foreclosed from restoring funds that have already been suspended or terminated except in accordance with the procedures set forth in its statute.

Because the relevant provisions of the two statutes differ markedly, and because our conclusions with respect to their import for the two agencies differ correspondingly, we discuss them separately.

### I. The Crime Control Act

Section 518(c)(1) of the Crime Control Act, 42 U.S.C. § 3789d(c)(1), prohibits discrimination on grounds of race, color, religion, national origin or sex, by a state or local government, in a program or activity receiving funds under a grant administered by LEAA. Section 518(c)(2), 42 U.S.C. § 3789d(c)(2), which was added to the Act in 1976 by Pub. L. No. 94-503, 90 Stat. 2418, sets out the administrative procedures by which the nondiscrimination provisions in the preceding paragraph are enforced. In relevant part these require LEAA, upon receiving notice of a "finding" by a federal or state court or administrative agency to the effect that there has been a "pattern or practice" of discrimination in violation of subsection (c)(1), to set in motion an administrative procedure leading to suspension and, ultimately, termination of funds. Under this procedure LEAA must notify the chief executive of the affected governmental unit that a program or activity has been found not to be in compliance, and must request that officer to secure compliance. 42 U.S.C. §§ 3789d(c)(2)(A)(i) and (ii). If after 90 days compliance has not been secured, and if an administrative law judge has not "made a determination under subparagraph (F) that it is likely the state government or unit of local government will prevail on the merits," LEAA "shall notify" the Attorney General that compliance has not been secured "and caused [sic] to have suspended further payment of any funds under this chapter to that program or activity."

---

(D. Md. 1976). Professor Moore states that where a court of appeals grants a stay of an interlocutory order, "the grant of such a stay seems tantamount to deciding that the interlocutory injunction was improperly granted." Moore's Federal Practice, § 62.05 at 62-26.

42 U.S.C. § 3789d(c)(2)(C). The "determination under subparagraph (F)" is explained in that section as follows:

> Prior to the suspension of funds under subparagraph (C), but within the ninety day period after notification under subparagraph (C), the State government or unit of local government may request an expedited preliminary hearing on the record in accordance with section 554 of title 5, in order to determine whether it is likely that the State government or unit of local government would, at a full hearing under subparagraph (G), prevail on the merits of the issues of alleged noncompliance. A finding under this subparagraph by the administrative law judge in favor of the State government or unit of local government shall defer the suspension of funds under subparagraph (C) pending a finding of noncompliance at the conclusion of the hearing on the merits under subparagraph (G).

At the "full hearing" under subparagraph (G) referred to in this section, the issues of discrimination are heard on the merits, and LEAA must make "a finding of compliance or noncompliance." If LEAA makes a finding of "noncompliance," the Attorney General "may" terminate the payment of funds. 42 U.S.C. § 3789d(c)(2)(G)(ii).

Once funds have been suspended by LEAA there are only four circumstances, set out in subparagraph (D), under which payment may be resumed: (1) if the recipient enters into a compliance agreement approved by LEAA and the Attorney General; (2) if the recipient "complies fully with the final order or judgment" of a court or administrative agency, if that order or judgment covers all the matters raised in LEAA's original notice of noncompliance; (3) if the recipient "is found to be in compliance with subsection (c)(i) by such court";[2] and (4) if after a hearing LEAA finds "that noncompliance has not been demonstrated." [3] 42 U.S.C. §§ 3789d(c)(2)(D)(i) through (ii).

. This statutory scheme suggests an intention on the part of Congress to limit agency discretion in certain respects (e.g., mandatory commencement of proceedings upon notice of a "finding," and mandatory suspension of funds 90 days thereafter); at the same time, it permits LEAA to reach its own independent conclusions on the issues of discrimination raised, and ultimately to make an independent decision to lift or continue a suspension pending a full administrative hearing on

---

[2] The statute inexplicably fails to give the same effect to a similar finding of an administrative agency.

[3] Subparagraph (D) makes reference to a hearing "pursuant to subparagraph (F)." But subparagraph (F) describes the "expedited preliminary hearing" before an administrative law judge. It is subparagraph (G) which describes the full hearing in which LEAA determines the issue of compliance on the merits. We think the reference in subparagraph (D) to subparagraph (F) is mistaken, and that it should instead be read as a reference to the hearing described in subparagraph (G).

the merits of the discrimination charge, by showing a likelihood of success at a preliminary hearing. But the statute does not spell out what relationship if any Congress intended there to be between LEAA's enforcement procedures once they have been set in motion, and any ongoing judicial or administrative proceedings which may have triggered them in the first place.

The legislative history of the 1976 amendments to the Crime Control Act does little to clarify this relationship. It manifests congressional dissatisfaction with the lack of initiative shown by LEAA in enforcing the nondiscrimination provisions of the Act, and an intent to remedy this by forcing the agency into action whenever a court or another agency "finds" the recipient to have engaged in a "pattern or practice" of discrimination. Thereafter, however, it would appear that LEAA was perceived as having an enforcement role independent of contemporaries and related court proceedings. The House report states that "the Committee bill will require the Administration to honor the discrimination findings of State and Federal courts and State and Federal agencies *by then beginning its own enforcement process* with the sending out of noncompliance notices to recipients found by others to have discriminated." H.R. Rep. No. 1155, 94th Cong., 2d Sess. 26 (1976) (emphasis added).[4]

The more important evidence of LEAA's independence comes from a reading of the statute itself, and from a comparison of its provisions with the analogous provisions of the Revenue Sharing Act. Unlike the Revenue Sharing Act, the Crime Control Act contains no provisions requiring deference on the merits to the triggering "finding" in any part of the administrative process. Rather, it would seem that this "finding" operates on the agency only to spur it into "beginning its own enforcement process."[5] As will be discussed in greater detail below, the analogous sections of the Revenue Sharing Act are considerably more explicit with respect to the further substantive effect that should be given the triggering judicial determination.

---

[4] The Senate bill had made no changes in the nondiscrimination provisions of the Crime Control Act, and the conference committee reported out provisions that were in all pertinent respects identical to those in the House bill. *See* H.R. Rep. No. 1723, 94th Cong., 2d Sess. 32 (1976).

[5] One of the difficulties in construing LEAA's obligations under these provisions of the statute is Congress' failure to define what it meant by a "finding." It is not clear in the statute or its legislative history whether this term was meant to include preliminary or interlocutory "findings," or whether it should be limited to formal findings after a full hearing. LEAA's own regulations do not define the term, but that agency has apparently interpreted it to include the findings embodied in a preliminary injunction order. If the "finding" is viewed solely as a triggering mechanism, then we would have no basis on which to quarrel with LEAA's expansive definition of the term. If, on the other hand, a "finding" were to be considered more or less determinative of the agency's own actions on the merits in connection with fund suspension, as it appears to be under the Revenue Sharing Act, we would be less comfortable with the notion that Congress intended to include in the term "finding" any statement or action of a court with respect to a complaint brought before it. *See* note 8 *infra.* It is precisely because under the Crime Control Act a court's "findings" are not substantively binding on LEAA that we are constrained to agree with that agency on the legal effect of a stay.

To be sure, the Crime Control Act provides that payment of suspended funds should be resumed if the recipient "complies fully with the final order or judgment" of a court. But, by implication, any court action short of a "final order or judgment" would in itself permit no such resumption. Therefore, when funds have already been suspended by LEAA, a stay in the related judicial proceeding does not, in our opinion, have any effect on the suspension. On the other hand, where funds have not yet been suspended and the agency inquiry is still under way, the statute does not appear to compel any particular agency response to developments in litigation involving the same issues. The opportunity provided the recipient in subparagraph (F) to defer suspension by demonstrating a likelihood of success on the merits before an administrative law judge suggests a general congressional policy underlying the Act which we think would permit LEAA to defer its own suspension proceedings where a stay has been granted by the court whose "findings" triggered those proceedings in the first place. This is, however, a matter of policy and not a matter of law.

In sum, based on our reading of § 518(c)(2) of the Crime Control Act and its legislative history, we agree with LEAA that its administrative process is independent of the triggering judicial or administrative proceedings; that suspended funds may be resumed only upon the happening of one of the events specified in subparagraph (D); and in particular that it is not required under the statute to bring its own administrative process to a halt in the event a stay is obtained in a contemporaneous and related judicial proceeding. On the other hand, we do not think LEAA is precluded from taking into account the implications of a stay order in the course of its own pre-suspension proceedings. The congressional policy reflected in subparagraph (F) would fully support a decision by LEAA to honor such a stay, and defer suspension pending a full administrative hearing on the merits. Indeed, we think in some circumstances LEAA would not be remiss in its responsibilities under the statute in deferring all administrative action pending a resolution of the issues raised in the court proceeding.[6]

## II. The Revenue Sharing Act

The 1976 amendments to the Revenue Sharing and Crime Control Acts were passed on October 13 and 15 of that year, respectively. In both cases Congress was seeking to strengthen the nondiscrimination

---

[6] LEAA's own regulations appear to recognize the desirability of coordinating its enforcement efforts with contemporaneous litigation involving the same issues. For example, the regulations provide that if an LEAA complainant has also filed suit in federal or state court, and if the trial of the suit would be in progress during the LEAA investigation, LEAA "will suspend its investigation and monitor the litigation through the court docket and contacts with the complainant." 28 C.F.R. § 42.205(c)(5). In addition, when a triggering "finding" has been made more than 120 days before LEAA learns of it, notification of noncompliance will be deferred pending an inquiry into the current status of the case. 28 C.F.R. § 42.210(c).

enforcement provisions of prior law, and to provide mechanisms to compel the two agencies to commence proceedings looking toward termination of federal funds in the event a recipient state or local government were found by a court or agency to have discriminated in violation of federal law. The provisions intended to accomplish this objective in the two Acts turned out quite differently, however, primarily because the Senate took an active role in amending the Revenue Sharing Act and displayed little or no interest in the nondiscrimination provisions in the Crime Control Act. The House bills amending both Acts contained essentially identical enforcement provisions. These were enacted without substantive change into the Crime Control Act amendments, and without any separate contribution from the Senate. *See* note 4 *supra.* But the Senate had its own proposals to make with respect to the Revenue Sharing Act, proposals that were quite different from those of the House, and that were in the main accepted by the Conference Committee.

The "compromise" [7] reached in conference between the House and Senate on the nondiscrimination enforcement programs of the Revenue Sharing Act was enacted into § 122 of the Act by Pub. L. 94–448, 90 Stat. 2350, and is codified in § 1242 of title 31. A brief review of its pertinent provisions shows how the Senate's approach differed from that of the House in the Crime Control Act. Like the analogous provisions of the Crime Control Act, § 122(b)(1) contains a triggering mechanism for the commencement of administrative enforcement proceedings leading to fund termination. This triggering mechanism is described in § 122(c)(1) as a "holding" by a federal or state court, or federal administrative law judge, that the recipient state government has discriminated in violation of federal law. [8] Once the Secretary of the Treasury has received notice of a "holding," a notice of noncompliance must be sent the recipient, and the fund termination procedure set in motion. [9] Subsections (b)(2) and (b)(3) describe a hearing procedure

---

[7] 122 Cong. Rec. 34,099 (Sept. 30, 1976) (remarks of Rep. Drinan, a sponsor of the bill in the House).

[8] Unlike the triggering events in § 518(c)(2) of the Crime Control Act, the triggering events under the Revenue Sharing Act are not restricted to a "pattern or practice" determination, and no effect is given determinations of a State administrative agency.

[9] Although you have not asked our opinion on the issue of whether a "holding" under the Revenue Sharing Act includes an interlocutory order, we note the position of ORS that it *does* include such orders in reaching our ultimate conclusions on the effect of a stay of such an order. In its regulations, ORS defines a "holding" as "any finding of fact or conclusion of law . . . which has been litigated . . . ." 31 C.F.R. § 51.67(a). ORS has taken the position that a preliminary injunction constitutes a "holding" for purposes of triggering its administrative fund suspension procedure, a position which we do not understand your Division to dispute. LEAA appears to take the same position with respect to a "finding" under the Crime Control Act. *See* note 5 *supra.*

We also note here that we do not think Congress intended to attach any particular significance to the use of the term "holding" in the Revenue Sharing Act, as opposed to the term "finding" used by the Crime Control Act. No difference between the two terms was asserted in Congress, and none has been claimed by either LEAA or ORS. As it happened, the term "holding" was the one employed by the Senate in its revenue sharing bill, and the term "finding" was employed by the House in both its crime control bill and its revenue sharing bill. The terms "holding" and "finding" are used inter-
Continued

493

before the Secretary of the Treasury and, if requested subsequently, an administrative law judge. It is at this point that the two statutes part ways. Where the two-step hearing procedure under the Revenue Sharing Act has been triggered by a "holding" on the issues of discrimination, the substance of this "holding" may not be collaterally attacked before either the Secretary or the administrative law judge. That is, the recipient may present evidence to the Secretary only on the issue of whether the program or activity in which discrimination is charged has been federally funded, and not on the merits of the discrimination charge itself. If the Secretary determines that federal funds are involved, and if the recipient then requests a further hearing before an administrative law judge, that officer too is precluded from addressing the discrimination issue on the merits. In case there remains any doubt, subsection (c)(2) restates the restrictions on the administrative process as follows:

> If there has been a holding described in paragraph [(c)(1)] with respect to a State government or a unit of local government, then, in the case of proceedings by the Secretary pursuant to subsection (b)(2) of this section or a hearing pursuant to subsection (b)(3) of this section with respect to such government, such proceedings or such hearings shall relate only to the question of whether the program or activity in which the exclusion, denial, discrimination, or violation occurred is funded in whole or in part with funds made available under subchapter I of this chapter. *In such proceedings or hearing, the holding described in paragraph [(c)(1)] . . . shall be treated as conclusive.*

31 U.S.C. § 1242(c)(2) (emphasis added). Unless the Secretary or administrative law judge finds that the program in which discrimination is charged is not federally funded, the Secretary "shall" suspend payment of funds.

Subsection (e) of the statute sets out the five grounds on which suspended payments may be resumed where a "holding" has triggered the suspensions: 1) if the recipient government enters into a compliance agreement with the government agency or office responsible for prosecuting the claim or complaint which is the basis for the holding, if the agreement has been approved by the Secretary;[10] 2) if the recipient government "complies fully with the holding," if that holding covers all matters raised in the Secretary's notice of noncompliance; 3) if the

---

changeably in both the Senate report and the conference report on the revenue sharing bill, suggesting that that body did not focus at all on the difference, if any, between them. *See* S. Rep. No. 1207, 94th Cong., 2d Sess. 32 (1976); H.R. Rep. No. 1720, 94th Cong., 2d Sess. 35–36 (1976). Indeed, in discussing the conditions for resumption of funds both reports speak of resumption of compliance with an "order" of a federal court, where the statute uses the term "holding." *Id. See* 31 U.S.C. 1242(e)(2).

[10] The compliance agreement is described in subsection (d)(1).

recipient is found to be in compliance by the court or agency that issued the holding; 4) if the administrative law judge determines that the recipient is in compliance under subsection (b)(3)—a determination which may be based only on the presence or absence of federal funds, not the merits of the discrimination claim; and 5) if the body that has issued the triggering holding is reversed by an appellate tribunal. This final condition of lifting the suspension is also dealt with in subsection (c)(3):

> If a holding described in paragraph [(c)(1)] is reversed by an appellate tribunal, *then proceedings under subsection (b) of this section which are dependent upon such holding* shall be discontinued; any suspension or termination of payments resulting from such proceedings shall also be discontinued.

31 U.S.C. § 1242(c)(3) (emphasis added).

The acknowledgment in subsection (c)(3) that the administrative proceedings are "dependent" on the proceedings in the triggering body is reflected generally in the grounds for resumption of suspended payments described above. Three of the five grounds are for all practical purposes beyond the control of the Secretary: the first, a compliance agreement, is grounds for resumption of payment only where it is entered into by the parties to the triggering lawsuit or complaint. The third ground depends on the recipient's compliance as determined by the triggering body. And the fifth ground depends entirely on the action of an appellate tribunal in reversing the triggering holding. Although there is some independent role reserved to the agency with respect to the first, second, and fourth grounds, the agency is always bound to follow the lead of the triggering body whenever the merits of the discrimination issue are involved.

The congressional concern to limit the independent enforcement authority of the Secretary of the Treasury where there has been a prior holding of discrimination is reflected in the legislative history of the 1976 amendments to the Revenue Sharing Act. As with the Crime Control Act, Congress was aware of widespread dissatisfaction with the agency's failure to use its suspension power even where the recipient agency had been adjudged by a federal court to be in violation of the law. *See Hearings before the Subcommittee on Revenue Sharing of the Senate Finance Committee,* 94th Cong., 1st Sess. 173, 197, 214 (1975). *See also United States* v. *City of Chicago,* 395 F. Supp. 329 (N.D. Ill. 1975), *aff'd* 525 F.2d 695 (7th Cir. 1976). However, the Senate's contribution to the provisions that emerged in 1976 as the Conference "compromise" reflected equally strong concerns to minimize the burden of enforcement on ORS staff, and "to safeguard the due process rights of the recipient." S. Rep. No. 1207, 94th Cong., 2d Sess. 29 (1976). These concerns resulted in the development of provisions limiting the discre-

tion of ORS where a court or federal agency proceeding was in progress.

The hearings in the Senate Finance Committee in August of 1976 took place after the House had reported out its bill amending the Revenue Sharing Act. That House bill contained nondiscrimination enforcement provisions virtually identical to those ultimately enacted in the Crime Control Act. The Senate committee was not satisfied with these provisions on two grounds: first, they placed too heavy an enforcement responsibility on the staff of the Office of Revenue Sharing, whose officers testified that they did not wish to assume a larger role in civil rights enforcement; and second, they failed to afford a recipient government adequate protection against administrative arbitrariness and duplicative hearings. The General Counsel of the Treasury Department testified that the elaborate procedures set forth in the House bill "would really require a multiplication of the staff with very little effect overall," and that "the mechanics set up in the House-passed bill would create tremendous administrative burdens." *Hearings before the Senate Committee on Finance on H.R. 13367,* 94th Cong., 2d Sess. 48–49 (1976). He recommended that more reliance be placed on the ability of a court to monitor compliance, and less on the independent ability of ORS to enforce the law. The committee also heard testimony from a number of state and local government officials. The comments of Patrick Lucey, Governor of Wisconsin, are typical:

> An ideal system of anti-discrimination enforcement would emphasize both due process and simplicity to preclude the federal government from arbitrarily suspending revenue sharing funds in any jurisdiction. Deadlines should be short, and findings of discrimination should be based on the administrative and judicial process which does not rely solely on the judgment of the Secretary of the Treasury.

*Id.* at 89. Kenneth Gibson, Mayor of Newark, New Jersey, complained that "federal civil rights enforcement requirements are oftimes duplicative and contradictory in nature." He recommended that "a strategy be developed to consolidate and coordinate federal civil rights enforcement in general and that due process be observed in any withholding of funds from local government." *Id.* at 92–93. In a colloquy with Senator Packwood, Mr. Gibson and John Poelker, Mayor of St. Louis, discussed the due process problems inherent in simultaneous and potentially contradictory administrative and judicial proceedings. Senator Packwood asked how to construct "a fair section" that would not "unduly penalize" a recipient during the pendency of a court suit. Poelker recommended that "[i]t should be left up to the decision of the court, not the Secretary. . . . As long as the suit is pending, and the

locality has not been found in violation until that time," funds should not be suspended. Both Mayors Poelker and Gibson emphasized that in their opinion the inequity of terminating funds prior to "the end of the suit" outweighed the possibility of undesirable continuance of funds during its pendency. *Id.* at 77–78.

The general criticism of the House bill in the Senate committee led to the drafting of the provisions that eventually were enacted as § 122. The problems of delay, unfairness, and duplication that witnesses per- ceived to be inherent in the House approach were sought to be re- solved by provisions linking the ORS administrative role more closely with proceedings brought before courts and other agencies. The Con- ference Committee accepted the Senate bill in all pertinent respects. H.R. Rep. No. 1720, *supra,* at 34.

From the foregoing discussion it is clear that the terms of the civil rights enforcement provisions of the Revenue Sharing Act and their legislative history are substantially different from those of the Crime Control Act. We believe these differences warrant a different conclu- sion with respect to the effect a stay on administrative fund suspension proceedings under the two acts. Under the Crime Control Act, once the administrative enforcement proceeding has been triggered by a "finding," LEAA operates independently of the finding. Under the Revenue Sharing Act, ORS proceedings are "dependent" from begin- ning to end on the concurrent judicial or federal agency proceedings. Since ORS is barred from making its own determination on the issue of discrimination once there has been a court determination, we think it must also respect the court's subsequent decision to stay the effect of that determination. This is consistent with the Senate's concern not to burden ORS staff with massive civil rights enforcement responsibilities, and to ensure recipient governments due process of law. In the case of LEAA, however, to the extent that that agency remains free to reach its own decision on the merits of the discrimination issues prior to suspending funds, we do not believe the law requires it to honor a judicial stay—although we also think that it may do so in its discretion.

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
